Afternoon, may it please the court. My name is Corrie Hong and I represent Petitioner Jean-Louis. I wish to reserve two minutes and I will watch my own time. Okay. I will be discussing persecution, withholding, and then asylum. On persecution, the BIA claimed that Mr. Louis only feared extortion by his stepbrothers. This is error. The agency ignored that when the stepbrothers found out that Mr. Louis was bisexual, they killed his husband, burned the body in public, and threatened to kill him for tarnishing the family name. There is no doubt that this past harm rises to persecution. In footnote seven of the government's brief, the government wisely conceded that the BIA had failed to consider the assassination, the burning of the body, and the death threat as past persecution. In this footnote, the government asks for a remand. But when the BIA gets the facts wrong, as it did in Parada and Cup, this court has the authority to declare past harms as rising to past persecution. By not looking to what the actual harm was, the BIA also erred in claiming that there was no nexus between the past persecution and the protected ground. The BIA's nexus finding was based on a mistake, again, that only extortion was at issue. By not looking, the second error then on the persecution claim was that the BIA did not credit the credible testimony that the stepbrothers killed Bernard and threatened to kill Mr. Lewis because he had tarnished the family name. The government did not defend this finding, and under Cower and Lopez Galarza, remand is not warranted when the agency does not follow the facts to their only reasonable conclusion. On withholding, the only remaining element that the BIA gave in denying withholding is that the Haitian government was willing and able to stop anti-LGBT violence because the IJ found that, quote, same-sex relationships are allowed in Haiti, unquote, and that the police received biased training. This finding is not supported by the record. Same-sex marriage is not legal in Haiti. There is no law that protects LGBT people from discrimination. The Haitian police will not investigate crimes against LGBT people, and the police often participate in violence against LGBT people who report being crime victims. Over 90% of the Haitians disapprove of homosexuality, and the police themselves report feeling social pressure to not help LGBT people who are seeking protection. Applying Bringas-Rodriguez, no reasonable fact finder concluded that the Haitian government is controlling the attackers and protecting the attacked. This record then establishes that Mr. Lewis isn't also entitled to withholding because he's established the past elements of past persecution, nexus, and the unwilling and unable prong. If the court agrees, remand, however, is warranted on the withholding claim as a presumption of a well-founded fear. It is not possible to permit the DHS an opportunity to rebut the presumption of a well-founded fear. Turning to the asylum, there are three ways for the court to resolve the firm resettlement issue. First, the DHS did not meet its burden to prove that the Brazilian government offered Mr. Lewis permanent status. Well, didn't, I mean, wasn't he asked, do you have permanent residency in Brazil? And he said, yes. When he was pro se, your honor, that is correct. The IJ asked the compound question, did you have permanent residency in Brazil? As a pro se litigant, he answered yes. Well, I mean, that can, that cannot resolve the DHS burden when the 2016 state department identified that the status that Mr. Lewis received was quote, temporary protection that only guaranteed healthcare, social assistance, and the right to work. That's at AR 910. Credible testimony explained that President Bolanoso campaigned on the promise to deport Haitians. And then the 2018 state department report has no mention of this humanitarian status supporting the assertion that it wasn't in fact permanent and that's at 534. What are we supposed to do with the fact that the IJ applying the appropriate standard addressed the question, didn't rely on a concession of a firm resettlement, but applying the appropriate standard found that there had been firm resettlement. The BIA reviewing that, reviews it under the wrong standard, instructs the IJ to apply the appropriate standard. The IJ then applies the wrong standard, finds no firm resettlement, finds firm resettlement, and then the BIA affirm is based on the wrong standard. It seems to me that what we're supposed to do is send it back to the BIA to apply the proper standard. Yes, your honor. And Majora Gonzalez absolutely supports that remedy. That when there's an ambiguity in the record, everything should be sent back. Well, I don't think the record's ambiguous at all. They applied the wrong standard. Yes. Yes, your honor. I mean, there, there are different ways to, to read the record. I read it as an error, at which point the remand would be warranted. If the court agree or finds that there's an ambiguity, remand is still warranted. And to further support your point, your honor, it gets even more bizarre in that in August, 2020, the BIA affirmed the IJ firm resettlement finding in AR4. And that was based on the November 12th, 2019 IJ decision that claimed that the board affirmed the court's finding that it was firmly resettled, that's an AR77. But this is wrong because that order that, that prior order in April, 2019, the BIA said, quote, the immigration judge did not previously address the issue and remand the issue, and that's at 732, so it appears that the agency kept reaffirming a decision that in fact was never fully found. And as you pointed out, was never definitely, and the last time around was never found on their correct standard. And can I ask, just to clarify, when you say that when you're talking about the wrong standard, do you mean that they were looking at whether he was persecuted in Brazil as opposed to whether the factors under the former 208.15 were met? Is that, is that the error in standard that you're talking about? Well, there, there, the, the, the Aiden case decided in 2000, 2021 after the decision has a very nice, clear format that has to be followed that first of all, the DHS has the burden to prove resettlement, if that is met, then there's a question of whether there is an exception, which in this case, the facts would only go to the restrictive requirement and there the IJ did not engage in that, it went into then asylum and withholding, but did not expressly deal with the, the restrictive, the, the, the restricted residence exception. Okay. And, and, and where, where would I look to see where you asked, or, or, or you made an argument based on restricted residence? Cause when I look at your brief to the BIA, you know, there's a discussion of whether he was subject to persecution in Brazil, but I don't believe there was any reference to 208.15, you know, either explicitly or, or to, you know, the substance of what it refers to. And your honor, I did not, um, uh, file the brief before the BIA, but on the, at the, at the, uh, reply brief on page 21 and 22 in footnote three, um, that has all the, the record citations as to when the firm resettlement issue was raised to the IJ and to the BIA. Well, the, the firm resettlement issue writ large, but not, uh, as I could tell the, the question of, uh, restricted residence, uh, under the regulation. Uh, your honor, the, the best answer I can give you is that age at page 711 in the record, and that is the briefing that was filed to the immigration judge where there's a rest or I'm sorry, I believe it was to the BIA where it recited the aspect of the record, uh, where the Brazilian government failed to adequately protect Mr. Lewis from, uh, discrimination, harm, and violence on the basis of a sexual orientation. And that has been at, uh, 710, 711 and 712 is the, or 713 is the briefing. And if there are no facts, please, is a factual matter. This was raised. Is that, is that what you're saying? I'm sorry, your honor. Saying that as a factual matter, this was the question of whether or not he was, could be adequately protected was raised. Yes, your honor. And the BIA itself and its findings, um, repeatedly referred to the fact that there was no exception, um, that was, that was presented either. So it did expressly affirm those findings for purposes of exhaustion. Well, wait, wait. I mean, they say there's no exception. I mean, is it your view that that's sufficient to preserve any conceivable exception that somebody might've raised? I mean, I mean, I'll, I'll look at the record pages you cited, but, uh, but assuming that I don't think that that was adequate, uh, to raise it, is it your view that just because the board said, we think he's firmly resettled that that, that necessarily means that they reached, you know, all the arguments you might have raised as to why he wasn't? Well, your honor, the, under the exhaustion doctrine, when the agency makes the finding, the court has the, the, uh, authority to review that. And also the secondary way by which the, the, uh, an issue can be exhausted is when the party actually raises it. And I would submit both are, are, are, are actually raised, but the answer to your question would be the 710 to 713 citation is the best answer that I have to show what was raised to the agency below. Okay. Thanks. And if there are no further questions, may I reserve my remaining time? Of course, let's hear from the government and then you, then you've got some time. Good afternoon, your honors, Jessica Daugherty for the department of justice. Um, I would like to first address the exhaustion issue since it seems to be fresh in everyone's mind about firm resettlement. Uh, I, the government's position is actually that the restricted residence exception was the only issue with respect to firm resettlement that was litigated and raised at any point before the agency, all of the arguments that are now presented before this court about whether or not the status was permanent or whether the government met its original burden under the AGG rubric to demonstrate an offer of permanent resident resettlement was not exhausted. None of that was ever presented before the agency, and we have no record upon which for this court to review in that regard. Help me. And I would like to, can I help me understand what you just said? You said that firm resettlement was raised in front of the BIA, right? But then you said something else was not raised, but it sounds as though what you told me wasn't raised, went to the question of firm resettlement. So tell me, tell me a little more specifically what you mean. Sure. Let me clarify. I'm sorry if that was confusing. Under matter of AGG, there's a four step framework. And the first step is that the government bears the burden of proving an offer of firm resettlement. This court has considered steps, essentially one through three together under the AIDEN decision and the RA decision, A-R-R-E-Y. This government has talked about that in terms of the first step, but under the board, it really, the board's decision, there's four. The first is that the government bears the burden of establishing an offer of firm resettlement. And then the applicant bears the burden of rebutting that offer and demonstrating that the prima facie evidence of an offer of firm resettlement was not permanent or that it was not applicable or that that person would not be eligible for it. And that never happened in this case. Nobody ever contested that Mr. Louie had permanent residence in Brazil. He had admitted as much at page 854 of the record. It was a simple question. Did you have status in Brazil? Yes, I had permanent residence status. And he never said that that status was taken away or that he wouldn't be able to get it. All of the testimony, all of the briefing, both pro se and with counsel before the agency, all rested on the step four of the board's decision and the restricted residence exception under the regulation as to whether or not the firm resettlement was essentially rebutted because the conditions were unsafe or that he did not have a residence there that would be, that would qualify him as being resettled. Well, now I think I'm confused. So it's your position that he has exhausted the question of whether there was a restrictive residence within the meaning of 208.15? Yes. To the extent that that was raised, I would point the court to page 21 of the record and it's a footnote and it says, and it maintains the objection to the firm resettlement and specifically just says, should, you know, if the case were to come back to this court, Mr. Louie testified that his ability to work was severely, and then it's missing a word, but I would imagine that was restricted. And he suffered constant threats and abuse. That goes solely to the restricted residence exception. That does not go to the terms of his permanent residence and whether or not he had an offer of resettlement in Brazil. And so the government's position is, is that initial step one through three, all of the, does he have the offer of permanent residence was not ever exhausted. A challenge to that determination was not exhausted. Okay. Well, I had not understood that aspect of your position, but if it is your position that he did exhaust restricted residence, then, then when we look at what the board actually said, it seems pretty inadequate because all they talk about is whether his treatment in Brazil constituted persecution. And, you know, even if we agree that it didn't, that doesn't really answer the question of whether there was a restricted residence. So if it's exhausted how, how can we, don't, don't we have to remand? Cause they, they didn't address the claim. No, because they did address the agency, did address the claim. Um, unfortunately this case is so procedurally complex that there are dozens of pages of decisions and each decision incorporates the prior decisions on the issue. So it's not as simple as looking to one paragraph of an agency decision to see what those holdings were. And when you look through all of the agency decisions that were incorporated, the agency did consider whether his residence was, was restricted. The agency made findings that he was able to maintain a job, that he testified that he was able to travel throughout the country and Brazil, and that he... Can you, can you point, can you, can you point me to those findings? And when you say the agency, are you saying the BIA? I'm saying both the BIA and the IJ. Well, but, but, but it makes a difference because the BIA remanded to the IJ for a determination as to whether there had been persecution and that's not the right standard. Um, correct. That's not the, that's, that's separate from the restricted residence. That is true. Um, if you look at page 795 of the record, um, that is under the, I want to make sure I have the, the date of this, that's the immigration judge, and I'm going to start with the immigration judge's decision. I know you asked me about the boards, but I promise I'll, I'll track this. No, this is the IJ that's applying the right standard. The BIA never applies the right standard. It applies the wrong standard and then remands to the BI, to the IJ to apply the wrong standard. But no, this is the IJ who's applying the right standard, but the BIA never reviewed this decision under the proper standard. So when you say agency, it matters whether it's the IJ or the BIA that you're talking about. Well, I, I respectfully disagree. I don't think that the, that the board ever applied the wrong standard. I think the board talked about whether Mr. Louie would face persecution in his country of resettlement, which is in line with what this court requires under the strict restricted residence exception. If you look at the court's language in Aiden and in Array, the court talked about the restricted residence exception and as whether or not somebody has a safe residence, um, in the country of resettlement. And, and that's what the board was evaluating. Um, so the board did not go through the regulatory requirements and the factors one by one, but did consider the immigration judge's factual findings. Well, if you, if you, if you had turned to AR 731 and this is the, one of the decisions by the BIA, I'm at the bottom of that page and it's a run over paragraph to the top of AR 732, the BIA writes, we note that the firm resettlement bar does not operate, however, if the respondent has a well-founded fear of persecution in the country of resettlement, that's not the right standard. Uh, and then the paragraph goes on and the BIA writes, as the immigration judge did not previously address this issue, we will remand the record for further consideration as to whether or not there's a well-founded fear of persecution. They've remanded for a determination that's not the appropriate under the proper standard. It is, well, I guess I have two answers to that question. Pardon my pause, because it is really two concerns there. The first is whether somebody has a fear of persecution in the country of resettlement is relevant to the restricted residence exception. And that that's very clearly laid out in the aid in case. And if I can provide a site, um, that would be 989 F third at 10 80. Um, and, and in that case, this court talked about, um, fear of persecution in the country of resettlement as being part of that analysis under the regulatory exception. And there are other cases in which the court has also done that. If you look at, um, this is a little bit ancillary, but the ICI case, I S S E at eight 40 federal appendix, 102. Uh, it talks about, uh, the person in that case, uh, did not suffer any sort of persecution in the country of resettlement. And that was part of being considered there. And then finally in the array case, uh, this court similarly talked about whether or not there was a fear of persecution in the context of the restricted residence. So while it's not the factors enumerated under the regulation, it is part of what this court has required for the restricted residence exception analysis. And so it's only natural that the board would employ that analysis in a case arising within this jurisdiction. Before your time, before your time runs entirely, uh, of course, firm resettlement only goes to asylum. And even if there is firm resettlement withholding is available, assuming it's available on the facts of withholding, could you address the question as to whether or not, uh, there was a showing of inability or unwillingness of the Haitian government to protect, uh, as, uh, based upon sexuality? Yes, Your Honor, that this is one of those cases that really comes down to the standard of review. And there must be compelling evidence that would require this court to overturn the agency's determinations. And here, while yes, there are citations and, and, and sentences within the state department reports that talk about violence against, um, the LGBTQI community, there are also facts that the agency relied upon demonstrating that  the agency was willing to protect the LGBT community and that the government is moving forward towards protections of, uh, members of this community. And so that does not compel the reversal of the agency's determination. It may be a different conclusion and a different fact finder might reach. Well, as I read the country report, uh, there's really virtually no showing of willingness to protect, and we have his own testimony that when there is a demonstration in favor of LGBTQ rights, the police are beating the protesters. That doesn't sound, that doesn't sound as though somebody interested in protecting the rights, uh, the sexuality rights is being protected, rather they're being beat up by the cops precisely because that's who they are and what they're advocating. The testimony about that incident was a little unclear as to whether or not the police were, um, participating in the protest or trying to control the protest. So I would, um, disagree with that. But does the testimony say that the police were beating the protesters? Um, I, I don't have it at the site in front of me. I will look at that and, and submit it if I, if I misrepresent it. We're perfectly capable of reading the record, but my understanding of the police were beating up on the protesters, uh, which says that far from protecting, they're in fact engaging in persecution. Uh, I, I read the record differently, your honor, and it was that they, that the police were trying to control the crowd. Um, and so that it was a reasonable interpretation of that testimony. Um, but I, I would like to note that this is, again, it has to be compelling evidence, but also in order for petitioner to prevail here, he has to enable an unwilling determinations. Um, the government only needs to prevail on one of them. Though, right. I mean, he, he could still get withholding, uh, even if he's firmly resettled, couldn't he? He could still get withholding if he was firmly, uh, well, the, uh, if he was firmly resettled, he could still get withholding, but then he correct. Yes, he could, he would be ineligible for asylum, but there is also the alternative order of removal to Brazil. So that would, um, perhaps protect him from being removed to Haiti, but not to Brazil. Um, so in terms of any other points about the withholding, um, determination, it, I just would like to remind the court that it is a dispositive determination and it's unrelated to the past persecution finding. Um, some of the violence that is described in the record in the state department reports, um, is insufficient to demonstrate that unable and unwilling. And I would refer the port to the low long decision at 44 F 3rd, 1179, uh, which talks about a continuing conflict and those problems, not undermining the ability of the police to protect, um, the society in question. And if the court has no further questions, we would rest on our brief. Okay. Thank you. Uh, Ms. Hong, you've saved some time. Uh, thank you, your honor. I have three quick points. The first at AR 107 and 108, uh, Mr. Lewis was asked by his counsel, did they arrest, referring to the police, any of the people that were throwing rocks at the demonstrators, Mr. Lewis said, no, as a matter of fact, they were in favor of them because they were doing a good work. So they came to eliminate, eliminate us unquote. So that goes to your question or to your point, uh, judge Fletcher that the police were actively engaged in harming the LGBT community, which is also corroborated at AR 111, when lesbians were gang raped by the police and at AR 982, when, um, a man was beaten, the police said, if your brother beat you because you were gay, then you were well beaten unquote, um, I would respectfully like to submit that this record does compel granting withholding on those alone on the second point. And this is the more complicated one on the firm resettlement issue. Um, um, to correct an earlier statement to judge Miller, AR 21, um, the footnote identified by the government does, uh, is the proper one that deals with the issue to the BIA. Um, what the government overlooked is that in this footnote, um, Mr. Lewis's counsel said, quote, that he does not concede that he was firmly resettled unquote, and then goes on to point to the record where, where there was a factual dispute on that firm resettlement. Um, and so the third issue is that I would concur that in light of the confusion and the procedural history, that a remand would, would probably be the best course of action, um, for the BIA to resolve this and for the IJ to have a new hearing and, and, or a new finding on whether the record, um, shows resettlement or not. Okay. Anything further? And if there are no further questions, may I submit the case? Yes. It's me before we quit. Ms. Hong, are you participating as part of our pro bono program? Uh, or are you doing this in some other capacity? Uh, I, not for this case, um, but I am at the Florence project full time. So, so it was a part of the, it's, it's a part of my job now to do pro bono work full time. Okay. Thank you. Then those, we also have a pro bono program where we reach out and solicit counsel, but this is not one of these cases. No, we have a number of other cases with the court on those, but, but not this one. Okay. Thank both sides for helpful arguments. Uh, Louie or Lewis versus Garland is now submitted. Okay.
judges: SCHROEDER, FLETCHER, MILLER